Jeffrey H. MIMS, Chapter 7 Trustee of Auto International Refrigeration, Inc., Appellant,

v.

FIDELITY FUNDING, INC. and Guaranty Business Credit Corporation, Appellees.

No. CIV.A.3:02–CV–0973–P.

United States District Court, N.D. Texas, Dallas Division.

Oct. 15, 2002.

Kevin M. Lippman, Jeffrey D. Dunn, Mark L. Nastri, Munsch, Hardt, Kopf & Harr, Dallas, TX, for Appellant.

Richard Ernest Anderson, Richard, Jaramillo & Associates, Bruce W. Bowman, Jr., Godwin Gruber, Dallas, TX, for Appellees.

## MEMORANDUM OPINION AND ORDER

SOLIS, District Judge.

Before the Court is Brief of Appellant Jeffrey H. Mims, Chapter 7 Trustee of Auto International Refrigeration, Inc. ("Appellant") filed July 1, 2002, response brief and cross-appeal of Guaranty Business Credit Corporation ("GBCC") d/b/a Fidelity Funding, Inc. ("Fidelity") filed July 22, 2002, and Appellant's reply brief filed August 5, 2002.

Appellant and Cross–Appellant seek reversal of a March 15, 2002 Bankruptcy Court Order holding the loan at issue was not usurious, GBCC did not breach the loan agreement, equitable subordination was not proper, and disallowing $54,243.06 in unmatured interest. For the reasons set forth below, this Court finds that the March 15, 2002 order of the Bankruptcy Court granting summary judgment should be AFFIRMED in part, and REVERSED and REMANDED in part.

### PROCEDURAL HISTORY

This is an appeal from a bankruptcy proceeding before the Honorable Judge Harold C. Abramson which stems from a Loan and Security Agreement (the "Loan Agreement") entered into on June 30, 1998 between borrower AIR and lender Fidelity. On June 11, 1999, GBCC entered into an Asset Purchasing Agreement with Fidelity in which the Loan Agreement was transferred to GBCC. On May 28, 1999 Auto Refrigeration, Inc. ("AIR") filed a petition for relief under Chapter 11 of the Bankruptcy Code. Apnt.'s Br. at 1. On September 27, 1999, GBCC, a creditor of AIR, filed a Proof of Claim in the AIR bankruptcy case for $224,730.51. On November 2, 1999, the bankruptcy case was converted to a Chapter 7 bankruptcy case, with Appellant subsequently appointed Chapter 7 Trustee for the AIR Estate. Id.

On September 11, 2000, Appellant initiated an adversarial proceeding against Fidelity asserting claims for usury, breach of contract, and for equitable subordination of GBCC's claim in AIR's bankruptcy. On December 6, 2000, GBCC was added as a joint and several defendant. On March 15, 2002, the Bankruptcy court ruled the Loan Agreement was not usurious, the Loan Agreement had not been breached and equitable subordination was not proper. Furthermore, the Court disallowed $54,243.06 as unmatured interest. Mims v. Fid. Funding, Inc. (In re Auto Int'l Refrigeration), 275 B.R. 789 (Bankr. N.D.Tex.2002). It is from this decision which Appellants and Cross–Appellants appeal.

### RELEVANT FACTS

The Court finds the Bankruptcy Court's fact statement to be accurate, and therefore adopts it as follows. As of the date of the bankruptcy petition, AIR had outstanding debt under the terms of the Loan Agreement which was entered into on June 30, 1998. Under the Loan Agreement, Appellees offered AIR a revolving credit loan (the "Loan"), secured by, among other things, all of AIR's accounts receivable, allowing AIR to borrow and repay advances of principal up to a Facility Limit of $1,500,000. Pursuant to the Loan Agreement, the amount of principal that

could be borrowed by AIR at any one time was limited under a prescribed Borrowing Base formula based on AIR's accounts receivable,[1] with the aggregate amount of outstanding principal limited to the lesser of the Borrowing Base or the Facility Limit. The stated interest rate under the Loan Agreement was prime plus 2.5%, with the interest rate fluctuating between 10.25% and 11% over the eleven months prior to bankruptcy.

In addition, the Loan Agreement also called for various fees and charges to be paid by AIR, including Initial and Annual Facility Fees, Due Diligence Deposit, Attorney's Fees, Collateral Monitoring Fee, Audit Fee, and other Additional Expense Reimbursements. When these fees became payable by AIR, they were recorded on AIR's account, with interest accruing on the fees from the date recorded. The initial advance of principal under the Loan Agreement was made on June 30, 1998 in the amount of $581,661.07, but this amount included the Initial Facility Fee in the amount of $22,500.

Under the terms of the Loan Agreement, the filing of a bankruptcy petition constituted an event of default ("Event of Default"). While the majority of the Events of Default gave the Appellees the option of accelerating the entire principal amount of the debt by notifying AIR of its intent to do so, if the Event of Default was AIR's filing of bankruptcy, all of the obligations under the Loan Agreement would automatically be immediately due and payable. However, if an Event of Default did occur, and the Loan Agreement was accelerated resulting in usurious interest being charged, the Loan Agreement included a Savings Clause requiring Appellees to reduce the interest to a non-usurious amount.

On July 9, 1999, Appellees, believing that the Loan Agreement had exceeded the legal interest rate of 18% allowed under Texas law,[2] sent a letter attempting to cure the situation ("Cure Letter") to AIR's counsel, pursuant to Texas Finance Code § 305.103(a),[3] stating that AIR's account had received a credit of $68,825.40.[4] Then

1. Section 1.1 of the Loan Agreement provides in pertinent part:

"Borrowing Base" means an amount equal to the sum, determined by [Appellees] from time to time, of (a) 80% of the face amount of Eligible Accounts, plus (b) the lesser of 50% of the value of Eligible Inventory, valued at the lower of cost or market. [Appellees] may change the percentage of Eligible Accounts or Eligible Inventory constituting the Borrowing Base from time to time based upon dilution and other factors deemed appropriate by [Appellees].

2. Section 303.009(a) of the Texas Finance Code provides in pertinent part that "if the rate computed for the weekly, monthly, quarterly, or annualized ceiling is less than 18 percent a year, the ceiling is 18 percent a year."

3. Section 305.103(a) of the Texas Finance Code provides:

(a) A person is not liable to an obligor for a violation of this subtitle if:
(1) not later than the 60th day after the date the creditor actually discovered the violation, the creditor corrects the violation as to that obligor by taking any necessary action and making any necessary adjustment, including the payment of interest on a refund, if any, at the applicable rate provided for in the contract of the parties; and
(2) the person gives written notice to the obligor of the violation before the obligor gives written notice of the violation or files an action alleging the violation.

4. The July 9, 1999 letter from Appellees to AIR provides in pertinent part:

...pursuant to applicable law, this letter is to notify [AIR] that on July 9, 1999, [Appellees] discovered that [they] had violated the interest rate limitation provisions of Texas law by charging AIR interest in excess of the maximum amount authorized by law in

on July 12, 1999, Appellees sent a second Cure Letter to AIR's counsel confirming a second credit of $4,070.96.[5] Appellant responded to these Cure Letters by sending a letter to Appellees on September 14, 1999, alleging certain matters which it contended made the Loan Agreement usurious.

Appellant alleged the Loan Agreement was not only facially usurious, but when the Loan Agreement was accelerated, which Appellant claims occurred not only by the express terms of the Loan Agreement, by operation of bankruptcy law, and by affirmative action of the Appellees, the Loan Agreement became usurious. Appellant believes that the maximum amount of interest that could have been charged over the term from closing to bankruptcy was $40,794.41, but when the $33,993.71 in interest actually charged by Appellees was added to the $144,467.44 in fees which it alleges to be interest, the total interest charged over that same time period was $178,460.97. Subtracting the maximum amount of interest that could have been charged from the alleged interest, Appellant believed that Appellees charged AIR $137,669.56 in usurious interest.

Appellant alleged that Appellees charged AIR usurious interest and asked the Bankruptcy Court to assess triple penalty pursuant to Texas Finance Code § 305.001,[6] equaling $413,008.68. In addition, Appellant alleged that more than twice the legal amount of interest was charged, and Appellant asked the Bankruptcy Court to award it the principal on which the usurious interest was charged, plus the interest and fees charged by Appellees pursuant to Texas Finance Code § 305.002,[7] which amounted to $1,933,716.92. Appellant asked that those penalties, totaling $2,346,725.60, be assessed against the Appellees, which if done, would net $2,131,995.09 after elimination of Appellees' Claim of $224,730.51. Appellant also alleged that Appellees were in breach of the Loan Agreement because they did not "promptly" refund the usurious interest Appellant believes to have been charged, and thus requested an amount at least equal to the usurious interest charged of $137,669.56. Finally, Appellant requested that Appellees' allowed claim in the bankruptcy be equitably subordinated, pursuant to 11 U.S.C. § 510(c), to all other allowed claims based

connection with the Loan and Security Agreement dated June 30, 1998...[and] pursuant to applicable law, on July 9, 1999, [Appellees] corrected the above violation by crediting the account of AIR the amount of [$68,825.40].

5. The July 12, 1999 letter from Appellees to AIR provides in part that "on July 12, 1999, [Appellees] credited the account of AIR the additional amount of [$4,070.96]. [Appellees have] now credited the AIR account for all interest charged in excess of the maximum rate allowed by law plus interest on such amount".

6. Section 305.001(a) of the Texas Finance Code provides:
 (a) A person who contracts for, charges, or receives interest that is greater than the amount authorized by this subtitle is liable

to the obligor for an amount that is equal to the greater of:
 (1) three times the amount computed by subtracting the amount of interest allowed by law from the total amount of the interest contracted for, charged, or received; or
 (2) $2,000 or 20 percent of the amount of the principal, whichever is less.

7. Section 305.002(a) of the Texas Finance Code provides in pertinent part: "[A] person who contracts for, charges, or receives interest that is greater than twice the amount authorized by this subtitle is liable to the obligor for the principal amount on which the interest is contracted for, charged, or received as well as interest and all other charges."

upon Appellees charging of usurious interest under the Loan Agreement.

Appellees responded by alleging that not only was the Loan Agreement not facially usurious, but even if the Loan Agreement had been accelerated, which it alleges did not occur, the Loan Agreement would still not be usurious because the fees which Appellant believed to be interest, were actually "bona fide" fees, and as such could not be interest. Appellees also asserted that even if the fees were in fact interest, they were to be spread over the contracted-for term of the Loan Agreement, and not the shorter time from closing to bankruptcy, which would make the Loan Agreement non-usurious. Finally, Appellees raised the defenses of the Cure Letters and the Savings Clause to defeat any potential usury.[8] As to Appellant's breach of the Loan Agreement claim, Appellees believed that they were not in breach because no usurious interest was charged, AIR had not performed under the Loan Agreement by paying back principal and interest, and any usurious interest that was charged was "promptly" cured by Appellees' Cure Letters.

The Bankruptcy Court held that the Loan at issue was not usurious, GBCC did not breach the Loan Agreement, equitable subordination was not proper, and the Court disallowed $54,243.06 in unmatured interest.

Based on the foregoing, the issues which the parties have put before this Court for determination are as follows:

1. Whether the Bankruptcy Court erred in its analysis and conclusions as to whether or not certain fees charged by Appellees should be characterized as additional interest on the Loan,

2. Whether the Bankruptcy Court erred in holding that the term of the Loan was not automatically accelerated as of the Petition Date,

3. Whether the Bankruptcy Court erred in the methodology used to spread interest over the term of the Loan,

4. Whether usury violation was prevented by the Savings Clause,

5. Whether usury violation was cured by GBCC's Cure Letters, and

6. Whether GBCC was an assignee without knowledge, and not liable for the usury violation.

## DISCUSSION

### I. Standard of Review

■ This Court reviews a bankruptcy court's conclusions of law *de novo*. *In re Hinsley,* 201 F.3d 638 (5th Cir.2000). Accordingly, the *de novo* standard of review is applicable to each issue presented on appeal from the Bankruptcy Court's Summary Judgment Order as they pertain to issues of law.

### II. Classification of Fees

#### A. Usury

■ The Texas Finance Code prohibits creditors from contracting for, charging or receiving interest in excess of the statutory limit on a loan of money. TEX. FIN. CODE § 305.001. To prevail on a claim of usury, a plaintiff must show "(1) a loan of

**8.** Appellant argued that Appellees' Cure Letters defense failed not only because the letters lacked the required content, but the letters also failed because they did not correct the usury violation that Appellant believed occurred. Appellant also argued that the Savings Clause failed not only because the Loan Agreement was facially usurious, but for a Savings Clause to be effective, the Clause must be effectuated by the lender and also correct the entire violation that Appellant believes occurred.

money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of the money by the borrower." *First Bank v. Tony's Tortilla Factory, Inc.*, 877 S.W.2d 285, 287 (Tex.1994)(citing *Holley v. Watts*, 629 S.W.2d 694, 696 (Tex. 1982)). Typically, lenders do not charge an interest rate above the legal rate. More commonly, usury is committed when the lender charges the borrower fees disguised as interest which, when added to the interest rate, result in the borrower paying higher than allowable interest rates.

■ The Texas Supreme Court has stated that "amounts charged or received in connection with a loan are not interest if they are not for the use, forbearance, or detention of money." *First USA Management Inc. v. Esmond*, 960 S.W.2d 625, 627 (Tex.1997). To determine this, the Court has held that "fees which are an additional charge supported by a distinctly separate and additional consideration, other than the simple lending of money, are not interest and thus do not violate the usury laws." *Tony's Tortilla*, 877 S.W.2d at 287. Furthermore, Courts may look past the label assigned to the fee in order to determine if the fee is a service charge or disguised interest. *Id.*

### B. Initial and Annual Facility Fee

■ According to the Loan Agreement, AIR was required to pay an Initial Facility Fee of 1.5% of the Facility Limit. Loan Agreement § 2.7. Appellee argues that the Initial Facility Fee was not interest but a legitimate fee charged which would allow AIR the "option to borrow" money at other times. Aple.'s Rsp. at 16. The Bankruptcy Court noted that in *Stedman,* the Texas Supreme Court held that "a fee which commits the lender to make a loan at some future date does not fall within

[the] definition of [interest]. Instead, such a fee merely purchases an option which permits the borrower to enter into the loan in the future." *Stedman v. Georgetown Sav. & Loan Ass'n,* 595 S.W.2d 486, 488 (Tex.1979). However, this Court agrees with the Bankruptcy Court in that the Initial Facility Fee is different from the fee in *Stedman.* The Initial Facility Fee was not paid in advance to hold open an option to borrow money at another time. If it had been, this would be distinct and separate additional consideration. Here, the fee was a condition precedent to the advance of principal under the Loan Agreement after the Loan had already been entered into. Thus, the Court affirms the Bankruptcy Court's holding that the Initial Facility Fee was interest, disguised as an additional fee.

■ Likewise, the Bankruptcy Court held the Annual Facility Fee was also interest. AIR was required to pay an Annual Facility Fee of 1% of the facility limit, payable on the anniversary date of the Loan. Loan Agreement § 2.7. This fee was supposedly a fee charged to ensure that the line of credit would be available for the term of the Loan Agreement. As the Bankruptcy Court noted, "once a lender agrees to enter into a loan, the lender is required to make the agreed amount of principal available to the borrower or be in breach of the loan." *Mims,* 275 B.R. at 803. Because it is clear that there is no distinctly separate and additional consideration for the Annual Facility Fee, the Court affirms the Bankruptcy Court's holding that the Annual Facility Fee was additional interest.

### C. Due Diligence Deposit

■ Fidelity charged AIR a Due Diligence Deposit which was necessary to determine if Fidelity should loan money to AIR. The fee of $15,000 was used to con-

duct background searches, lien searches, field audits, credit reports, and other investigatory activities to determine if the Loan should be made. The portion of the fee that Fidelity did not use in the due diligence process was later refunded to AIR. The Bankruptcy Court outlined factors to assist in evaluating if there was separate and additional consideration for the Due Diligence Deposit including:

> (A) what expenses the due diligence deposit is designed to defray; (B) whether the due diligence deposit is a one-time charge or is assessed throughout the life of the loan; (C) whether the due diligence deposit was charged regardless of whether the lender loaned any money or not; (D) whether the due diligence deposit was a separate charge in addition to a commitment fee; and (E) the difference between the lender's internal accounting treatment of the due diligence deposit and that of interest.

*Mims*, 275 B.R. at 805.

The Court agrees with the Bankruptcy Court's reasoning in using this test to determine that the Due Diligence Deposit was not interest, but rather a fee that was supported by additional and separate consideration. Therefore, the Bankruptcy Court's finding that the Due Diligence Deposit was not interest is affirmed.

### D. Attorney's Fees

 Pursuant to the Loan Agreement, AIR paid all attorney's fees connected with the Loan which amounted to $12,500 paid to in-house counsel and $2594.05 to Thompson & Knight, outside counsel. Appellant contends that Thompson & Knight's fees are not interest, while the in-house legal fees are hidden interest. In doing so, Appellant differentiates between fees retained by the lender and fees paid to third-party service providers. In *Texas Commerce Bank–Arlington v. Goldring*, 665 S.W.2d 103 (Tex.1984), the Texas Supreme Court held that attorney fees paid by Petitioner to outside counsel were not interest because they were consideration in addition to the lending of money. The Bankruptcy Court attempted to distinguish *Goldring* from the case at bar by finding that the nexus between attorney's fees and the Loan was not the making of the Loan, as it was in the case at bar. However, even if there is a nexus to the Loan, the legal services provided by outside counsel were provided as consideration for the fees paid. The Court agrees with Appellant in that separate and additional consideration exists for the legal services provided by Thompson & Knight. Furthermore, the Court agrees with the Bankruptcy Court's finding that in-house Attorney's Fees represent additional disguised interest on the Loan because those fees were not supported by distinctly separate and additional consideration apart from the Loan. Therefore, the Court reverses the Bankruptcy Court's holding that the legal fees paid to Thompson & Knight were disguised interest and finds the fees were supported by separate and additional consideration. Likewise, the Court affirms the Bankruptcy Court's finding that the in-house Attorney's Fees were disguised interest.

### E. Collateral Monitoring Fee, Audit Fee and Other Additional Expense Reimbursement

 AIR paid a Collateral Monitoring Fee each month, to reimburse Fidelity for expense in evaluating, inspecting, and analyzing AIR's collateral in connection with the Loan. AIR also paid an Audit Fee for costs associated with any audits of AIR's collateral, books and records by Fidelity's appraisers, auditors or accountants. Moreover, AIR paid Additional Expense Reimbursement for expenses incurred in

connection with the execution and processing of the Loan. The Bankruptcy Court held all of these fees to be disguised interest. In doing so, the Bankruptcy Court stated that "without the Loan, there would have been no occasion to charge fees at all, and as such, no separate and additional consideration was given." *Mims,* 275 B.R. at 808–09. The test, as outlined by the Texas Supreme Court is "amounts charged or received in connection with a loan are not interest if they are not for the use, forbearance, or detention of money." *Esmond,* 960 S.W.2d at 627. Applying this test, the Court finds that the fees at issue are for the use of the money, and according to *Esmond,* are disguised interest. The Court therefore affirms the Bankruptcy Court's holding that the Collateral Monitoring Fee, Audit Fee and other Additional Expenses Reimbursement are interest.

### III. Automatic Acceleration of the Loan

 Characterization of the Loan is the initial step in determining if the Loan was usurious. Next, the Court must perform a spreading analysis. " 'Spreading' can best be defined as a method of allocating over the life of a loan (or a portion of the loan, in the event the loan maturity is accelerated or the loan is prepaid) charges that the parties themselves have called interest or that a court would deem interest *regardless of the label given the charge by the parties.*" *Armstrong v. Steppes Apartments, Ltd.,* 57 S.W.3d 37, 47–48 (Tex.App.—Fort Worth, pet. denied.). Thus, the Court must ascertain the term of the Loan for the purpose of the spreading analysis.

 According to the Loan Agreement, upon the filing of bankruptcy, "all of the Obligations owing by [AIR] to [Fidelity] under any of the Transaction Documents shall thereupon be immediately due and payable, without demand, presentment, notice of demand or of dishonor and nonpayment, or any other notice or declaration of any kind, all of which are hereby expressly waived by [AIR]." Loan Agreement § 9. Clearly, Fidelity drafted this section in the Loan Agreement to allow for automatic acceleration upon filing for bankruptcy. The Bankruptcy Court is correct in holding that "clauses that terminate or modify a debtor's rights in an executory contract upon the filing of a bankruptcy petition are generally rendered unenforceable and are known as *ipso facto* clauses." *Mims,* 275 B.R. at 810 (citing 11 U.S.C. § 365(e)(1)). However, the Bankruptcy Court erred in holding the acceleration clause unenforceable in this instance because it overlooked the exception to the general rule. Section 365(e)(2)(B) of the Bankruptcy Code provides in pertinent part,

> (e)(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> > (B) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

Thus, it is clear that the Bankruptcy Code's invalidation of *ipso facto* clauses does not apply in this situation involving a contract to make a loan for the benefit of the debtor. Accordingly, the Court reverses the Bankruptcy Court's holding that the Loan was not accelerated. The Loan's maturity date was accelerated upon AIR's bankruptcy filing on the Petition Date.

### IV. Spreading Analysis

Because the Court holds that the Loan was accelerated on the Petition date, we

next turn to the spreading analysis. The spreading analysis should be performed by comparing the maximum amount of interest for which the Appellees were entitled to lawfully contract, charge or receive through the Petition Date with the total amount of interest actually charged, including fees that are judicially determined to be interest. We adopt the Bankruptcy Court's analysis in finding that $41,357.85 is the maximum interest Fidelity could have charged AIR through the Petition Date. The Court also adopts the Bankruptcy Court's finding that $165,903.22 is the total amount of interest actually charged after subtracting Thompson & Knight's attorney's fees which this Court found was not interest.[9] Thus, the Court holds that Fidelity collected usurious interest.

## V. Savings Clause

The Loan Agreement savings clause provided that:

The parties hereto intend to contract in strict compliance with applicable usury law from time to time in effect. In furtherance thereof, the parties hereto stipulate and agree than none of the terms and provisions contained in this Agreement or any other Transaction Document shall ever be construed to create a contract to pay, for the use, forbearance or detention of money, interest in excess of the maximum amount of interest permitted to be charged by applicable law from time to time in effect...

Loan Agreement § 2.14.

Usury savings clauses are valid in Texas and, in appropriate circumstances, are enforced to defeat a violation of the usury laws. *Armstrong*, 57 S.W.3d

at 46. The mere presence of a usury savings clause in a Loan Agreement will not save a transaction that is usurious on its face. *Id.* In analyzing the transaction to determine if it is usurious on its face, the Texas Supreme Court held that "[t]he contract under construction will not be found usurious on its face unless it expressly entitles the lender, upon the happening of a contingency or otherwise, to exact interest at a rate greater than that allowed by law." *Smart v. Tower Land & Inv. Co.*, 597 S.W.2d 333, 341 (Tex.1980). The Bankruptcy Court held that the Minimum Usage Fee was pure interest. The Minimum Usage Fee was a fee charged to AIR every month because the amount of interest income accruing on the outstanding principal balance was less than the stated amount. While it was hypothetically possible for AIR to borrow enough that the Minimum Usage Fee would not be charged, this never occurred. The effect of this was to require AIR to pay usurious interest on the actual amount of principal advanced to AIR for its use, from the inception of the Loan to the maturity date. In light of this usurious interest, the Court holds that the Loan Agreement was usurious on its face. Under this interpretation, the Court finds the Savings Clause is ineffective because it is directly contrary to the explicit terms of the contract.

## VI. GBCC's Defenses

### A. Cure

July 8, 1999, GBCC discovered the possibility that the Minimum Usage Fee as collected under the Loan Agreement was usurious. On July, 9 1999, GBCC gave written notice to AIR of the possible viola-

---

**9.** This amount is determined by subtracting $2,594.05 (Thompson & Knight Attorney's fees) from 132,640.19 (the Bankruptcy Court's fee determination), to get $130,046.14. Then, the amount of interest Fidelity actually charged as interest ($35,857.08) is added, which is $165,903.22.

860

tion and credited AIR's account $68,825. On July 12, 1999, GBCC sent a second letter to AIR indicating that an additional $4,070.96 had been credited to AIR's account. GBCC then sent a third letter November 12, 1999 reconfirming the credits given for any arguable excess interest and stating that no Minimum Usage Fee had been charged since May 28, 1999, nor would it be. GBCC asserts that these letters cured any usury law violation. The Bankruptcy Court held that "because the Loan Agreement was not facially usurious, nor was usurious interest charged because acceleration did not occur, it is therefore not necessary to reach a decision as to the other issues raised by the parties as to [Appellant]'s claim for usury," namely the effectiveness of GBCC's Cure Letters. In light of this Court's findings that the Loan was usurious on its face and that usurious interest was charged, the case is remanded to the Bankruptcy Court to determine if the Cure Letters did, in fact, cure the violation.

## B. Assignee Liability

Assuming, *arguendo*, that the letters did not cure the violation, GBCC next asserts that it was an assignee without knowledge on the Loan Agreement. As such, GBCC claims it should not be liable for any and all usury under the Loan. The Court likewise remands this issue to the Bankruptcy Court to resolve in the first instance.

## VII. Statutory Penalties

If the Bankruptcy Court determines that the letters did not cure the violation, and also that GBCC was liable as an assignee under the Loan Agreement, then the Bankruptcy Court must also determine the penalties applicable to GBCC in accordance with this Court's holding as to the usury violation.

## CONCLUSION

Having thoroughly reviewed the appellate record, the arguments of the parties, and the relevant law, the Court is of the opinion that the March 15, 2002 order of the Bankruptcy Court granting summary judgment should be AFFIRMED in part, and REVERSED and REMANDED in part.

**So Ordered.**