United States Court of Appeals
Fifth Circuit

**F I L E D**

July 14, 2004

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS
FIFTH CIRCUIT**

No. 03-20917

BETTY R. LOVICK, on behalf of herself
and all others similarly situated,

Plaintiff-Appellant,

versus

RITEMONEY LTD.; SNM INC.; CPCWA COMPANY LTD.,
doing business as Power Financial; GE & CE LLC,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

Before JOLLY, JONES, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Betty R. Lovick's putative class action claims a RICO violation, premised on the collection of a claimed unlawful (usurious) debt. The action was dismissed under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Lovick claims the fee charged by an automobile title loan broker amounts to disguised interest that, when attributed to the lender, causes the loan to be usurious. The Credit Services Organization Act (CSOA), TEX. FIN. CODE § 393 *et seq.*, permits brokers, however, to engage in the activities alleged in the complaint without attributing those fees to lenders. None

of Lovick's allegations involve activities proscribed by either CSOA or Texas usury law, TEX. FIN. CODE § 301.001 *et seq*. Accordingly, she cannot state a claim for usury. As a result, her RICO claim fails as well. **AFFIRMED.**

I.

As alleged in her operative second amended complaint, in responding in January 2002 to an advertisement for loans secured by automobile title, Lovick requested a $2000 title loan from CPCWA Company, Ltd. (d/b/a "Power Financial" and "Texas Jewelry & Financial Services"). The loan was to originate from Ritemoney Ltd. as lender, with CPCWA as broker. Lovick signed with Ritemoney a Loan Disclosure, Promissory Note and Security Agreement (the Note), which provided, *inter alia*: the amount financed was $2013 ($2000 to Lovick and $13 filing fee for asserting a lien on her vehicle); Lovick would pay a $1500 fee to CPCWA for "loan brokerage or other credit services"; and, for state law purposes, the interest rate was ten percent. (The federal truth-in-lending disclosures, reflecting a much higher rate of approximately 131 percent, are not in issue. Lovick does not present a claim under the Truth in Lending Act, 15 U.S.C. § 1606(a)(1)(A).)

The Note stated, in relevant part:

> **Payment of third-party fees:** In connection with any third-party fees such as fees for loan brokerage or other credit services, I acknowledge the following: I separately contracted with another company or person to receive brokerage or other credit services and

2

> agreed to pay for those services; I am responsible for such fees; I am voluntarily using part of this loan to pay for those fees; and *I understand that this loan is made by lender [Ritemoney] under Section 302.001 of the Texas Finance Code at a rate of interest not greater than 10% per annum and that a fee paid to a third-person [CPCWA] for arranging this loan (though required to be treated as finance charge for purposes of federal law disclosures) is for a separate service and not interest for purposes of Texas law.*

(Emphasis added.) Upon signing the Note, Lovick received a $2000 check, which she cashed at the CPCWA office. Subsequently, she made all of the required payments to, and through, CPCWA.

In 2003, Lovick filed her complaint against Ritemoney, CPCWA, and their respective general partners (SNM, Inc. and GE & CE L.L.C.)(collectively, defendants), claiming a Racketeer Influenced and Corrupt Organizations Act (RICO) violation, premised on collection of an unlawful (usurious) debt. 18 U.S.C. § 1962(c); TEX. FIN. CODE §§ 342.004, 342.005, 342.051, and 349.403. Essentially, Lovick claimed CPCWA's $1500 fee was "disguised interest" attributable to Ritemoney; when combined with the ten percent interest rate charged by Ritemoney, the fee caused interest exceeding the ten percent authorized by Texas law. *See* TEX. FIN. CODE § 342.004(a). This putative class action was on behalf of all persons who signed a Note with Ritemoney from 1 September 2002 through the 2003 filing date of this action.

After Lovick filed an amended complaint, defendants moved to dismiss under Rule 12(b)(6), claiming, *inter alia*, that Lovick

3

failed to state a claim for usury and, therefore, for the RICO claim premised on it. The district court agreed, holding that, because "no improper relationship is presented by the facts in [Lovick's] pleadings [, the brokerage fee cannot be usurious interest, and] no cause of action is alleged". It granted Lovick 30 days, however, to plead a factual basis for an improper relationship among defendants. After the second amended complaint was filed, the court ruled that Lovick still failed to state a claim and dismissed this action.

## II.

"[A] complaint should not be dismissed [under Rule 12(b)(6)] for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief". *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). Such a dismissal is reviewed *de novo*. *E.g., Herrmann Holdings Ltd. v. Lucent Tech. Inc.*, 302 F.3d 552, 557-58 (5th Cir. 2002). For that review, the complaint is construed in the light most favorable to plaintiff, accepting as true all well-pleaded factual allegations and drawing all reasonable inferences in plaintiff's favor. *Id*. at 558. On the other hand, "we may not rely upon conclusional allegations or legal conclusions disguised as factual allegations". *Jeanmarie v. United States*, 242 F.3d 600, 602-03 (5th Cir. 2001).

4

Lovick contends the district court erroneously applied Federal Rule of Civil Procedure 9(b)'s heightened pleading standard, applicable to allegations of fraud, instead of Rule 8(a)'s notice pleading standard. Rule 8(a) does not require pleading specific facts in support of each element of plaintiff's *prima facie* case; instead, plaintiff must "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests". ***Swierkiewicz v. Sorema N.A.***, 534 U.S. 506, 507 (2002) (quoting ***Conley***, 355 U.S. at 47). It appears that in dismissing the operative second amended complaint, the district court applied Rule 8(a), not Rule 9(b). *See* ***Lovick v. Ritemoney***, No. H-03-0218 (***Order of Dismissal***, 28 August 2003) ("The Court finds and holds that the plaintiff has failed to state a cause of action and the facts as pled do not support the view that a cause of action can be asserted."). In any event, Rule 12(b)(6) dismissals are reviewed *de novo*; in so doing, we will apply Rule 8(a).

For the claimed usury, Lovick alleges: (1) CPCWA handled all the usual tasks of the lender, including arranging advertising, credit review, collateral inspection, approval decision, paperwork preparation, issuance and cashing of checks, collection of payment, and deciding when to repossess collateral, and, in this way, Ritemoney shifted substantially all of its overhead to CPCWA; (2) CPCWA acted as an agent of, or joint participant with, Ritemoney, as evidenced by CPCWA's brokering all of its title loans to

5

Ritemoney as lender and Ritemoney's making all of its title loans through CPCWA, and CPCWA was authorized to act as Ritemoney's agent for the purposes of disbursing cash advances by signing checks on Ritemoney's account and collecting loan payments; (3) because all borrowers were expected to pay a brokerage fee to CPCWA to obtain a loan from Ritemoney, payment of the fee was effectively a prerequisite for a Ritemoney loan, and Ritemoney was aware from the Note and payment of the fees from loan proceeds that borrowers were expected to pay those fees to obtain a loan; and (4) these facts demonstrate a scheme both to evade the ten percent Texas usury ceiling for unlicensed lenders and to falsely suggest that CPCWA is separate from Ritemoney.

In the light of these allegations, Lovick contends: this alleged relationship between Ritemoney, as lender, and CPCWA, as broker, is sufficient under Texas law to impute CPCWA's brokerage fee to Ritemoney; and, because Ritemoney is already charging ten percent, the addition of the fee raises the interest rate above the ten percent limit.

Interest is compensation "for the use, forbearance, or detention of money". TEX. FIN. CODE § 301.002(a)(4). In the absence of other law, interest greater than ten percent is usurious. TEX. FIN. CODE §§ 302.001(b); 342.004(a). Under Texas law, the elements for a usury claim are: "(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by law for the use of the money

by the borrower". ***First Bank v. Tony's Tortilla Factory***, 877 S.W.2d 285, 287 (Tex. 1994). The third element for usury is at issue: whether the allegations are sufficient to withstand a Rule 12(b)(6) challenge on whether the fee paid to CPCWA is interest.

To say the least, a $1500 fee for a $2000 loan is more than questionable. And, Texas caselaw describes circumstances under which brokerage fees may be attributed to the lender as disguised interest for purposes of assessing usury. That caselaw, however, has been supplanted by Texas usury statutes, *see* TEX. FIN. CODE § 301.001 *et seq.*, and the Credit Services Organization Act (CSOA), enacted in 1987, *see* TEX. FIN. CODE § 393. These statutes govern interest and the conditions under which a broker may assess fees. First, we examine Lovick's allegations under pre-CSOA caselaw; then, we assess their viability under the usury statutes and CSOA. Because these statutes permit the alleged activities by CPCWA, its fee is not usurious interest.

### A.

Lenders can violate the usury laws by charging borrower fees that constitute "disguised interest". *E.g.,* ***First USA Mgmt., Inc. v. Esmond***, 960 S.W.2d 625, 627 (Tex. 1997). Whether a fee is of that nature turns, of course, on the substance of the transaction. *Id.* If the fee is supported by "separate and additional consideration apart from the lending of money [, it] is not

7

interest and cannot be the basis of usury". ***Tex. Commerce Bank-Arlington v. Goldring***, 665 S.W.2d 103, 104 (Tex. 1984).

Lovick maintains that the brokerage fee paid CPCWA is attributable to Ritemoney because: (1) CPCWA is Ritemoney's "general agent" or "joint participant"; (2) Ritemoney shifted its overhead to CPCWA, and lender overhead is treated as interest; and (3) CPCWA's having performed most of the tasks ordinarily performed by the lender, CPCWA is not a bona fide third party.

1.

Texas courts have long recognized that loan brokers may charge a fee for their services; the fee is not generally considered interest for usury purposes.

> It is recognized ... that charges made to the borrower by the lender's *special agent* for special services such as legal work in preparing documents, inspection of the property to be pledged as security and attending to the details of closing the loan are legitimate charges against the lender and will not taint the contract with usury.

***Morris v. Miglicco***, 468 S.W.2d 517, 519 (Tex. Civ. App. - Houston 1971, writ ref'd n.r.e.) (emphasis added) (citing ***Nevels v. Harris***, 102 S.W.2d 1046 (Tex. 1937); ***Sapphire Homes, Inc. v. Gilbert***, 426 S.W.2d 278 (Tex. Civ. App. - Dallas 1968, writ ref'd n.r.e.); ***Dewey v. American National Bank***, 382 S.W.2d 524 (Tex. Civ. App. - Amarillo 1964, writ ref'd n.r.e.)). If the brokerage fee is not

supported by separate and additional consideration, it *may* be considered interest, subject to usury laws.

> The general rule is that if a lender, or the lender's agent with the lender's knowledge or ratification, requires the borrower to pay a sum of money designated a brokerage fee to the lender or to the lender's agents, such payment will be considered a payment for the use by the borrower of the lender's money. If the sum so paid, together with the interest paid as provided in the loan contract, exceeds the lawful rate of interest the contract will be considered as providing for usurious interest.

*Morris*, 468 S.W.2d at 519 (citing *Adleson v. B.F. Dittmar Co.*, 80 S.W.2d 939 (Tex. Com. App. 1935)). Under pre-CSOA caselaw, the effect of this rule is to treat fees paid to third parties, if they constitute a condition imposed by the lender (or with the lender's knowledge) on the borrower for the loan, as fees paid directly to the lender. Lovick relies on this general agency theory in attributing the brokerage fee to Ritemoney. *See also Federal Mortgage Co. v. State Nat. Bank of Corsicana*, 254 S.W. 1002, 1005 (Tex. Civ. App. - Beaumont 1923, writ dism'd) (because payment of brokerage fee to lender's general agent is effectively payment to lender for making loan, fee may be considered usurious interest).

Along this line, Lovick notes that several courts have recognized an extensive or exclusive relationship between a broker and lender as evidencing that the broker is acting as the lender's agent. *See In the Matter of Dukes*, 24 B.R. 404 (Bkrtcy. Mich. 1982); *see also Dickey v. Phoenix Finance Co.*, 104 S.W.2d 806, 808

9

(Ark. 1937).  Further, when a lender has knowledge of an agent's fee, the lender is deemed to have authorized it.  *See **Dodson v. Peck***, 75 S.W.2d 461, 464 (Tex. Civ. App. - Amarillo 1934, writ denied).

The primary allegation at issue is:  CPCWA is either a general agent of, or a joint participant with Ritemoney in, Ritemoney's automobile title loan business.  As discussed, the supporting allegations are:  CPCWA and Ritemoney enjoy an exclusive relationship, with Ritemoney extending title loans only through CPCWA and CPCWA brokering title loans originating only from Ritemoney; CPCWA grants title loans only to borrowers paying the required brokerage fee; because Ritemoney was aware of the language in the Note referencing this fee and must have been aware that the fee was paid from funds loaned to the borrower, Ritemoney had knowledge that payment of the fee was a prerequisite to receiving a title loan; and this shows the alleged general agency, or joint participant relationship, between Ritemoney and CPCWA.

On the other hand, there are no allegations that CPCWA, not Ritemoney, selected the criteria for authorizing loans; instead, there are allegations that CPCWA applied certain criteria in making authorization decisions.  This relationship (following criteria set by Ritemoney) is consistent with special agency.  Texas law has long recognized that such relationships do not transform reasonable fees for broker services into interest attributable to lenders for

10

the purposes of assessing usury. *See, e.g., **Hughes v. Security Building & Loan Ass'n***, 62 S.W.2d 219 (Tex. Civ. App. 1933) (fee charged borrower by agent having only special or limited authority, as opposed to general authority, not considered interest and may not be attributed to lender for purposes of determining usury). In this regard, "[t]he charge made by [the broker] was for services rendered in connection with the loan. The charge thus made and paid ... regardless of its reasonableness or not, cannot form the basis for a usury penalty". ***Crow v. Home Savings Ass'n***, 522 S.W.2d 457, 460 (Tex. 1975).

As noted, Lovick's claim rests on pre-CSOA caselaw; moreover, the claim does not consider the line of Texas cases requiring the lender to *benefit* from the broker's fee in some way that is not incidental. As held in ***Commerce Sav. Ass'n of Brazoria County v. GCE Mgmt. Co.***, 539 S.W.2d 71, 79-80 (Tex. Civ. App. - Houston (1st Dist.) 1976), *modified by* 543 S.W.2d 862 (Tex. 1976), for a third party fee to be considered interest, the borrower must show: (1) the lender received some benefit from the additional fee; and (2) the additional fee paid to the third party "was a subterfuge to evade the usury statute". ***Id***. at 80. A benefit could include the lender's "receiv[ing] any part of such fees", but "incidental benefit[s]" to the lender are insufficient. ***Id.****; see also **Groves v. Nat'l Loan & Investment Co. of Detroit, Mich.***, 102 S.W.2d 508, 513 (Tex. Civ. App. - Ft. Worth 1937) (retention by lender's agent

11

of part of loan amount did not entitle borrower to cancel obligation as usurious unless borrower showed: retention was with lender's knowledge and consent; *and lender received benefit of retention*). Lovick has failed to allege an incidental benefit to Ritemoney, much less any direct benefit, such as the flow of all, or part, of the brokerage fee from CPCWA to Ritemoney. At most, Lovick's allegations *imply* a benefit to Ritemoney through its shifting some of its exposure to CPCWA. This is insufficient to demonstrate the requisite lender benefit for general agency.

2.

Lovick also alleges Ritemoney shifted its overhead to CPCWA. Under Texas law, fees charged by a lender for ordinary overhead constitute interest. *See, e.g.,* **Trinity Fire Ins. Co. v. Kerrville Hotel Co.**, 103 S.W.2d 121, 125 (Tex. 1937); Nicewander, Sheen & West, TEXAS USURY LAW HANDBOOK § 4:3 (1997) ("any charges for services normally incident to the making of loans, which are charged to the borrower for the lender's overhead expenses, are deemed interest for the purpose of determining usury"). Lovick alleges that Ritemoney shifted to CPCWA all of Ritemoney's responsibilities normally understood as overhead. Therefore, according to Lovick, CPCWA cannot contend that fees charged in consideration for these services are not interest. Lovick maintains: even though the services are provided by the broker, they are effectively lender overhead. Indeed, Lovick contends this overhead-shifting to the

12

broker is precisely the sort of "device, subterfuge, or pretense" proscribed by TEX. FIN. CODE § 342.051(b).

Lovick cites no Texas authority in support of her contention that fees for broker services may be attributed to the lender to the extent those services *could* have been part of a lender's overhead in a *non-brokered* transaction. To the contrary, these are separate services, in consideration for which the broker may charge a reasonable fee. Lovick points to **Mims v. Fidelity Funding, Inc.**, 275 B.R. 789 (Bkrtcy. N.D. Tex. 2002), *aff'd in part and rev'd in part*, 307 B.R. 849 (N.D. Tex. 2002), which noted that allowing the lender to escape any potential usury penalties by "farming out its overhead, which would otherwise be interest, to a third party, and having the borrower pay that agent directly ... would provide lenders with an avenue to game the system and defeat the true intent of the usury statutes". **Id**. at 800 n.13. On appeal, however, the district court rejected this portion of the holding, ruling instead that fees paid to third parties are not interest. **Mims**, 307 B.R. 849. The district court agreed with the bankruptcy court only with respect to certain fees that were retained by the lender (again, there is no allegation that Ritemoney received part of the brokerage fee paid to CPCWA) and for which the lender would not show separate and additional consideration for the use, forbearance, or detention of money. **Id**. at 856-58. Lovick cites no other authority for her overhead-shifting theory of recovery.

13

Finally, Lovick contends that a broker's performing many, if not all, of the tasks ordinarily performed by a lender evidences that the broker is not a bona fide third party. *General Southwestern Corp. v. State of Texas*, 333 S.W.2d 164, 166-68 (Tex. Civ. App. - Houston 1960, writ ref'd n.r.e.); *Donoghue v. State*, 211 S.W.2d 623, 628-29 (Tex. Civ. App. - Austin 1948, writ ref'd n.r.e.). Again, the cited Texas caselaw pre-dates CSOA (enacted in 1987).

In *General Southwestern*, as here, brokers solicited customers, performed credit checks, arranged for an agreement and note to be signed, and made an initial advance and collected payments. 333 S.W.2d at 165-67. In upholding a temporary injunction against making usurious loans, the court concluded that the proof at the injunction hearing indicated a closely integrated operation that included all of the brokering entities, as well as the two corporations holding the notes. *Id*. at 168.

Similarly, in *Donoghue*, the broker solicited borrowers, arranged for the execution of an agreement and note, determined security was adequate, and handled collection. *Donoghue*, 211 S.W.2d at 624-25. The court held: although there was an independent broker, the brokerage fee was a form of interest that rendered the loans usurious because, as the court found, the

operation was a joint venture between the broker and lender. *Id*. at 629.

As noted, Lovick rests this premise — that CPCWA is not a bona fide third party — on only two, pre-CSOA cases from Texas intermediate courts. She offers no explanation for her inability to identify more recent Texas authority.

B.

This lack of recent, relevant authority is because the Texas Legislature has addressed these and other issues through usury statutes and, more recently, CSOA. The usury statutes originated in Act of 23 May 1967, 60th Leg., R.S., ch. 274, 1967 TEX. GEN. LAWS 608-660, and are contained in Title 4 of the Texas Financial Code. TEX. FIN. CODE § 301.001 *et seq*. When enacted in 1987, CSOA was in former Chapter 18 of the Texas Business and Commerce Code, Acts 1987, 70th Leg., ch. 764, § 1; it became part of the Texas Financial Code. TEX. FIN. CODE § 393. (At least 31 States and the District of Columbia have credit services organization acts similar to the one enacted by Texas. *See, e.g.,* ARIZ. REV. STAT. § 44-1701 *et seq.;* ARK. CODE § 4-91-101 *et seq.;* CAL. CIV. CODE § 1789.11 *et seq.;* COLO. REV. STAT. § 12-14.5-101 *et seq.*)

The codification of Texas usury law and the enactment of CSOA governing loan brokers as credit services organizations (CSOs) has overruled by implication those cases interpreting brokerage fees of the type alleged here as potentially usurious interest. Again,

15

Lovick cites no post-enactment cases. In the light of Texas' more recent usury statutes and CSOA, the complaint fails to state a claim.

CSOA authorizes a CSO to charge a "credit service fee" by complying with certain requirements, such as: registration, § 393.101; a surety bond, §§ 393.401 - 393.407; disclosures, § 393.105; and notice of cancellation, § 393.202 (contract may be canceled within three days of date of transaction). *See* TEX. FIN. CODE § 393 *et seq.* A fee may not be charged if any of these requirements is not met, nor may one be charged merely for referring a customer to a retail seller of credit. TEX. FIN. CODE § 393.303. CSOA describes a CSO as follows: an entity that provides that, for valuable consideration, it will, among other things, "obtain[] an extension of consumer credit for a consumer". TEX. FIN. CODE § 393.001(3)(B). CSOA does *not* prescribe the amount that may be charged by a CSO for its services. Under the facts alleged, CPCWA is a valid CSO; Lovick has *not* alleged that CPCWA failed to comply with any of CSOA's provisions.

While CSOA regulates CSOs (such as brokers), Texas' usury statutes regulate lenders. Those statutes differentiate between loans charging interest rates of ten percent or less, which are unregulated, *see* TEX. FIN. CODE § 302.001 *et seq.*, and those charging more than ten percent, *see* TEX. FIN. CODE § 342.001 *et seq.* As stated in the Note, CPCWA is a third party providing credit

16

services, and Ritemoney is a lender charging ten percent interest under Texas Financial Code Section 302.001.

The usury statutes and CSOA work in harmony, permitting a CSO to charge a brokerage fee in connection with its services. Indeed, CSOA's proscribing a CSO from charging a fee for simply referring a customer to a lender, TEX. FIN. CODE § 393.303, cuts against Lovick's contentions regarding CPCWA's many services. Lovick alleges those services imply CPCWA is not a bona fide third party, or at least that it is performing tasks ordinarily understood as part of the lender's overhead. But, under CSOA, CSOs are expected to provide valuable services for their fee and are penalized if they provide too *few* services (not too many). *Id*.

It goes without saying that, when statutory language is unambiguous, we apply the "plain and common meaning of the words and terms used"; a "court may not strain on policy grounds to manufacture a [modification] of the statutory language to achieve a result obviously not intended by the legislature". *Moreno v. Sterling Drug, Inc.*, 787 S.W.2d 348, 352 n.2 (Tex. 1990) (quoting *Morano v. St. Francis Hospital*, 420 N.Y.S.2d 92, 95 (N.Y.Sup.Ct. 1979)). Sections 302 and 393 of the Texas Financial Code are unambiguous. Section 302 permits a lender to charge an interest rate of ten percent or lower; § 393, a CSO to charge a brokerage fee for arranging a loan.

17

The allegations in the operative second amended complaint confirm that CPCWA charged a credit services fee and that Ritemoney made a ten percent loan. All of the services alleged to have been provided by CPCWA are consideration for its fee, and there are no allegations of non-conformity with the requirements for valid CSO status as provided in § 393. The Texas Legislature has not restricted the amount of a CSO service fee in proportion to the services provided; we cannot substitute our judgment. In this regard, we are more than well aware that a $1500 fee for a $2000 loan appears quite excessive. Ameliorating this acute concern are two factors. First, Lovick's allegations do not provide any data for factors supporting or refuting why the amount is, or is not, reasonable. Second, we obviously cannot rule on issues on the basis of such concern; we are compelled to follow the law — here, CSOA.

Lovick, relying on pre-CSOA precedent, tries to blur the distinction between §§ 302 (governing unregulated loans charging ten percent interest or less) and 342 (governing regulated loans charging greater than ten percent), while ignoring § 393 (governing brokerage fees for CSOs). She does not cite any Texas cases that question, or even mention, the clear language of §§ 302 and 393, and their harmonious relationship. Nor does she cite cases from other jurisdictions that have enacted credit services organization statutes; yet those statutes have been in effect for many years.

"[U]nder Texas law, there is a specific presumption against a

18

finding of usurious interest". ***C.C. Port, Ltd. v. Davis-Penn Mortgage Co.***, 61 F.3d 288, 290 (5th Cir. 1995) (affirming Rule 12(b)(6) dismissal of action against lender alleging prepayment premium was usurious interest). Penal statutes, such as those for usury, are strictly construed under Texas law; recovery of a penalty must fit within the statutes' terms. *E.g.,* ***Hight v. Jim Bass Ford, Inc.***, 552 S.W.2d 490, 491 (Tex. Civ. App. – Austin 1977) (holding "doubt as to the intention of the Legislature to punish the conduct of the party should be resolved in favor of the defendant ... [b]ecause the provisions of the Consumer Credit Code are penal in nature ... [and] are to be strictly construed").

Lovick contends that CSOA's silence on whether brokerage fees may be considered disguised interest under certain broker/lender relationships suggests that we should not read into CSOA an endorsement of such fees. Instead, according to Lovick, CSOA provides *additional* borrower-protection, beyond that found in prior Texas cases holding some third party fees are disguised interest. She also contends that interpreting CSOA to permit these types of brokerage fees would amount to a partial repeal by implication of § 342.051(b), which proscribes the use of subterfuge or pretense to evade application of the usury laws.

CSOA expressly or impliedly permits the activities Lovick alleges CPCWA engaged in as a broker. Under CSOA, read in conjunction with the usury statutes, brokerage fees shared with the

19

lender are interest for the purpose of determining usury.  Again, Lovick does *not* allege CPCWA shared its fee with Ritemoney; nor does Lovick allege CPCWA and Ritemoney are the same entity.  Lovick does not even allege that CPCWA's charging a fee results in an incidental benefit to Ritemoney.  Ritemoney and CPCWA complied with CSOA, identifying CPCWA as a CSO that would be charging a fee for its services.

Because Texas law does not construe such credit service fees as disguised interest, Lovick's complaint fails to state a claim for usury.  Therefore, her RICO claim also fails.  Her complaint was properly dismissed.

### III.

For the foregoing reasons, the judgment is

*AFFIRMED*.


ENDRECORD

20

E. GRADY JOLLY, Circuit Judge, dissenting:


I respectfully dissent because I sense that something strange may be going on here and there has been no discovery. When the broker is getting 90% of the profit on a transaction, it is not unreasonable to think that perhaps the lender is somehow being benefitted; perhaps it is, in effect, receiving a usurious rate of interest from whatever arrangement it has with the broker. Perhaps the broker is paying a flat sum to the lender, or a percentage of its seemingly excessive nominal fee; this may amount to usury under the facts of this case, or it may suggest a conspiracy to commit usury. Or perhaps nothing untoward is going on. It may even be probable that this is a completely legal and legitimate operation.

Now, I do not disagree with the majority's scholarly analysis of Texas usury law and how it is affected by the CSOA, but it does seem that Lovick stated a litigable claim here. Lovick makes the following factual allegations in her Second Amended Complaint, which, at this stage of the case, we must assume are true:

1) CPCWA handled all the usual tasks of the lender: arrangement of advertising, credit review, collateral inspection, approval decision, paperwork preparation, issuance and cashing of checks, collecting payment, deciding when to repossess;

21

2) Ritemoney shifted all, or substantially all, of its overhead expenses, thereby disguising extra interest;

3) CPCWA acted as an agent of or joint participant with Ritemoney, as evidenced by its brokering *all* its title loans to this particular lender, and Ritemoney's making *all* its title loans through CPCWA;

4) Ritemoney required that all loans be negotiated by CPCWA and knew that the payment of the broker fee was a prerequisite for a loan;

5) Ritemoney entrusted the entire management of its title loan business to CPCWA, and CPCWA was Ritemoney's agent rather than the borrowers' agent;

6) The Promissory Note discloses the interest rate for TILA purposes to be 131.019%, but that, "for state law purposes," the "loan brokerage or other credit services" fee is being financed by the Note, while the interest rate is 10%.

In other words, Lovick alleges that CPCWA was doing more than serving as a mere arranger of loans, because it served as the lender's agent, and thus the 75% broker's fee was not for a separate service. Consequently, she alleges that the actual interest rate was usurious.

In short, Lovick has, in my opinion, pled enough facts to permit discovery and to allow the case to proceed at least to the summary judgment stage.

22

For the foregoing reasons, I would vacate the district court's judgment and remand for further proceedings and, for that reason, I respectfully dissent.